TAGGED OPINION



**ORDERED in the Southern District of Florida on May 28, 2024.**

Scott M. Grossman, Judge
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

In re:

BERNARDO GERMAN HUSSING,                        Case No. 22-16984-SMG

     Debtor.

_____/

PAMPA BEVERAGES, LLC d/b/a
TRANSNATIONAL SUPPLY,

     Plaintiff,

v.                                              Adv. No. 22-1383-SMG

BERNARDO GERMAN HUSSING, *et al.*,

     Defendants.

_____/

## **MEMORANDUM OPINION[1]**

---

[1] This memorandum opinion constitutes the Court's findings of fact and conclusions of law, as required by Federal Rule of Civil Procedure 52(a)(1), made applicable here by Federal Rule of Bankruptcy Procedure 7052.

Over nearly a decade, Bernardo Hussing pocketed more than $2 million in illicit commissions – more colloquially known as "kickbacks" – from his former employer's suppliers. That former employer, Pampa Beverages, LLC, contends Mr. Hussing owes it a debt in the amount of these ill-gotten funds, and that this debt is not dischargeable in his bankruptcy case under 11 U.S.C. § 523(a)(2)(A) because it is a debt "for money . . . to the extent obtained by . . . false pretenses, a false representation, or actual fraud." More specifically, Pampa argues that Mr. Hussing – as its employee – owed it a fiduciary duty and that he breached that fiduciary duty by collecting these commissions behind Pampa's back. As damages, Pampa asserts that Mr. Hussing must disgorge – or pay back to it – these commissions.

Mr. Hussing admits that he improperly accepted these commissions. Indeed, he acknowledged that it was wrong, unethical, and prohibited by his employment agreement. But he argues that he did not owe – and therefore could not have breached – any fiduciary duty to Pampa. Instead, as he readily acknowledges, he made promises to Pampa in his employment agreement (which included a written non-compete and non-solicitation agreement) and he broke those promises. This, according to Mr. Hussing, results in an ordinary – and otherwise dischargeable in bankruptcy – breach of contract claim.

Alternatively, Mr. Hussing argues that Pampa's breach of fiduciary duty claim is barred by the "independent tort doctrine" which – according to him – prohibits a plaintiff from recasting a dischargeable breach of contract claim as a non-dischargeable tort claim. As a further alternative, Mr. Hussing argues that even if

Pampa could assert such a tort claim, Pampa nevertheless failed to prove his conduct caused it any damages. As a corollary to these arguments, Mr. Hussing contends that even if he owes a debt to Pampa, it is not a "debt . . . for money . . . to the extent obtained by . . . false pretenses, a false representation, or actual fraud" that would be non-dischargeable under Bankruptcy Code section 523(a)(2)(A). Rather, because Pampa is asserting a claim for breach of fiduciary duty, it could only be non-dischargeable under Bankruptcy Code section 523(a)(4), which excepts from discharge "any debt . . . for fraud or defalcation while acting in a fiduciary capacity." But because Pampa has only asserted a cause of action for non-dischargeability under section 523(a)(2)(A) – and not under section 523(a)(4) – its claim must fail.

Pampa has also alleged that Mr. Hussing's daughter, Carolina Hussing, is liable to it for aiding and abetting Mr. Hussing's breach of fiduciary duty and for conspiring with him to breach his fiduciary duty. Ms. Hussing disputes these allegations. Finally, Pampa also sued Fenix Marketing, LLC and Votnik, LLC – two entities controlled by Mr. Hussing – for aiding and abetting Mr. Hussing's breach of his fiduciary duty and for conspiring with Mr. Hussing to breach his fiduciary duty. Fenix Marketing and Votnik have defaulted and therefore have not contested Pampa's allegations. The Court conducted a bench trial on February 26, 2024, and now makes the following findings of fact and conclusions of law.

## I.    FINDINGS OF FACT.[2]

### A.    Bernardo Hussing Moves His Family from Michigan to Miami to Head Up Pampa's New Transnational Supply Division.

Plaintiff Pampa Beverages, LLC was founded by Marcelo Young in 2003 as a wine and beer distributor.[3] It later expanded its business to buy other goods from suppliers and vendors throughout the world and sell those goods to retailers in the United States.[4] Defendant Bernardo Hussing at one time worked with Mr. Young at a company called Transnational Foods.[5] In 2013, Mr. Hussing was working in Michigan at an unrelated company called Marfood, Inc.[6] He then began negotiating with Mr. Young to move to Miami to head up Pampa's new Transnational Supply division as its business development manager.[7] Transnational Supply was not a subsidiary, affiliate, or other separate company from Pampa.[8] It was just a business line Pampa used for its non-food items like glassware, pet treats, and soaps.[9]

Mr. Hussing agreed to take the position. He quit his job at Marfood and moved his family to Miami to work for Pampa,[10] where he was given the title of vice president of business development.[11] The employment agreement between Pampa and

---

[2] To the extent any of these findings of fact are determined to constitute conclusions of law, they are adopted as such. And to the extent any of these findings of fact are determined to constitute mixed questions of law and fact, an appellate court should consider them under the standard set forth in *U.S. Bank Nat. Ass'n ex rel. CW Capital Asset Mgmt. LLC v. Village at Lakeridge, LLC*, 583 U.S. 387, 396 (2018) ("the standard of review for a mixed question all depends—on whether answering it entails primarily legal or factual work.").

[3] Trial Tr. (ECF No. 106) 10:7-18.

[4] Pretrial Order (ECF No. 96) ¶ a.

[5] *Id.* ¶ t; Trial Tr. at 11:12–12:16, 13:7-14.

[6] Pretrial Order ¶ u; Trial Tr. at 58:1-7.

[7] Trial Tr. at 13:15–14:7.

[8] *Id.* at 10:19–11:6.

[9] Pretrial Order ¶ bb.

[10] Trial Tr. 55:13–56:5.

[11] *Id.* at 18:14-18.

Mr. Hussing was not set forth in a single document. Rather, a series of e-mail exchanges,[12] together with a written "Non Compete and Non Disclosure Agreement" signed on June 1, 2013,[13] comprised his employment agreement with Pampa.

**B.    The Employment Agreement.**

       1.    <u>The Non-Compete and Non-Disclosure Agreement</u>.

The noncompete agreement prohibited Mr. Hussing from engaging in or becoming associated with any Competitive Activity.[14] The agreement defined a Competitive Activity to be one in which Mr. Hussing:

> becomes involved as an owner, employee, officer, director, independent contractor, agent, partner, joint venturer, advisor, or in any other capacity calling for the rendition of the Employee's personal services, with any individual, partnership, corporation or other entity that to any degree competes with the Subject Business or with any other related business hereinafter conducted by the Company, in any country where the Company or any of its affiliates operates or intends to operate as of the Termination Date.[15]

The agreement defined the Subject Business broadly, to mean "the business of manufacturing and sourcing South American wines and beer; *and the sourcing of non-food products to the US Retailers*."[16] The noncompete agreement also prohibited Mr. Hussing from (a) soliciting any of Pampa's employees or business associates to terminate their employment with Pampa, (b) soliciting any of Pampa's customers, and (c) taking any other action that might injure any of Pampa's business

---

[12] Pl.'s Exs. 1, 2.

[13] Pl.'s Ex 3.

[14] *Id.*

[15] *Id.* at § 3.1.1.

[16] *Id.* (emphasis added). The primary function of Pampa's Transnational Supply division was to source non-food products to U.S. Retailers.

relationships.[17] The parties agreed that money damages would not be a sufficient remedy for any breach, and that "in addition to any and all other rights and remedies at law, equity or otherwise," Pampa could "move for specific performance and/or temporary or permanent injunctive or other relief in order to enforce, or prevent any violations of, the provisions" of the agreement.[18]

2.   <u>The Other Terms of His Employment</u>.

As part of his employment agreement, Mr. Hussing agreed to close his wholly-owned company, Fenix Marketing.[19] Mr. Hussing said that he did not "think it is right, to have another business," and he agreed that he would bring to Transnational Supply any business opportunity he encountered and if Transnational Supply was "interested," they would do it, but "[i]f not," they would "discard it."[20] In short, Mr. Hussing agreed that he would work exclusively for Pampa's Transnational Supply division.[21] He also agreed to pay over to Pampa any commissions he received or was offered from any supplier.[22] As compensation, Mr. Hussing would earn a base salary of $120,000.00 per year, plus 40% of any net profits the Transnational Supply division earned.[23]

---

[17] *Id.* at § 3.1.3.
[18] *Id.* at § 5.
[19] Pretrial Order ¶¶ k, v–x.
[20] *Id.* ¶¶ v–x.
[21] Trial Tr. at 20:1-17, 21:18-23, 22:13-24.
[22] Pl.'s Ex. 2 at 5.
[23] *Id.* at 1, 4.

6

3.    <u>Mr. Hussing's Role and Responsibilities</u>.

Mr. Hussing began working at Transnational Supply in June of 2013.[24] Although he was given the title of Vice President – and later Chief Operating Officer[25] – of Transnational Supply, he was not actually an officer of Transnational Supply or of Pampa. Indeed, Transnational Supply was not even a separate entity. It was just a division and "d/b/a" for Pampa's non-food product line (which included pet treats). Mr. Hussing never had check signing authority over any company bank accounts.[26] He never signed contracts for the company.[27] He did not work with company accountants to prepare financial statements.[28] He didn't even have access to the company's profit and loss statements or accounting records.[29] He did not sign any company tax returns.[30] And he was not responsible for paying employees.[31] Rather, his role was to procure international and domestic sources of pet treats, soaps, and home glassware, which Pampa could then sell to U.S. retailers.[32] Despite the lofty titles, Mr. Hussing was nothing more than a sales representative for Pampa.

**C.    Mr. Hussing Starts Working for Pampa and Almost Immediately Violates His Employment Agreement.**

Shortly after he began working for Pampa, Mr. Hussing started breaking his promises. Specifically, he began receiving "commissions" (or kickbacks) from

---

[24] Pretrial Order ¶ aa.
[25] *Id.* ¶ cc.
[26] Trial Tr. at 83:14-17.
[27] *Id.* at 83:18-21.
[28] *Id.* at 83:22-84:2.
[29] *Id.* at 68:10-17.
[30] *Id.* at 84:3-4.
[31] *Id.* at 84:5-17.
[32] Pretrial Order ¶¶ bb, ee.

suppliers as consideration for procuring their business.[33] Some of these "commissions" were paid directly to Mr. Hussing and deposited into his personal bank account.[34] Other "commissions" went into bank accounts in the name of Fenix Marketing, which Mr. Hussing had promised to close and not use.[35] Still other "commissions" went into the account of another entity called Votnik, LLC,[36] which Mr. Hussing and his wife Ulla Rosensteiner formed in 2020.[37] At one point Mr. Hussing even created and used the fake name "John Votnik" to sign a consulting and brokerage agreement with Kwan Treats, one of Transnational's suppliers, on behalf of Votnik LLC.[38] He received four payments from Kwan Treats, totaling $24,800.00[39] under that agreement. In total, from June 2013 through July 2021, Mr. Hussing received over $2 million in "commissions" from Transnational's suppliers.[40] Mr. Hussing acknowledges that accepting these commissions violated the terms of his employment agreement (including the noncompete agreement) and that it was wrong and unethical for him to do this.[41]

### D.  Carolina Hussing Helps Her Parents Through a Bad Divorce.

One of Mr. Hussing's children, his daughter Carolina, was eighteen years old when Mr. Hussing moved his family to Miami to work for Pampa.[42] She later enrolled

---

[33] Pretrial Order ¶¶ hh, ii, rrr, sss, ttt, uuu; Pl.'s Ex. 34.
[34] Pretrial Order ¶ rrr; Pl.'s Ex. 34.
[35] Pretrial Order ¶¶ v, ii, sss, ttt; Pl.'s Ex. 34.
[36] Pretrial Order ¶ uuu; Pl.'s Ex. 34.
[37] Pretrial Order ¶¶ o, zz.
[38] *Id.* ¶¶ ll, mm, nn.
[39] *Id.* ¶ uuu; Pl.'s Ex. 34.
[40] Pretrial Order ¶¶ rrr, sss, ttt, uuu; Pl.'s Ex. 34.
[41] Trial Tr. at 85:22–86:2.
[42] *See* Pretrial Order ¶ g.

as a student at Florida International University and received a B.A. in criminal justice in 2017 and an MBA in marketing in 2021.[43] Around the time she was receiving her undergraduate degree, her parents were going through "a really bad divorce."[44] Her parents "didn't trust each other to handle finances," so it fell on Ms. Hussing to be a "mediator" and "communicator" for her parents, and to make sure bills got paid and that her siblings were taken care of.[45]

After the divorce was finalized, Ms. Hussing replaced her mother as signatory on joint bank accounts with Mr. Hussing[46] and as co-managing member of Fenix Marketing.[47] Although not a formal employee of Fenix Marketing (which had no employees), Ms. Hussing had a Fenix Marketing email address and used the title "business manager" on those emails.[48] She assisted her father in preparing[49] and processing invoices for the commissions he was to receive through Fenix Marketing.[50] She also updated a spreadsheet her father used to keep track of his commissions.[51] And, although she did not participate in any of his business meetings, she often accompanied her father on his international business trips.[52] While she did receive a few nominal payments of $970.00, $696.00, $466.00, and $1,630.00 from Fenix Marketing – which did include the notation "commissions" on them[53] – the Court

---

[43] *Id.* ¶ h.
[44] Trial. Tr. 102:8-19.
[45] *Id.* at 102:8-19; 104:6-12.
[46] *Id.* at 104:13-18.
[47] Pretrial Order ¶ l.
[48] *Id.* ¶¶ ddd, eee.
[49] Trial Tr. 105:10-17.
[50] Pretrial Order ¶ ccc.
[51] Trial Tr. 105:18–106:6; Pl.'s. Ex. 26.
[52] Trial Tr. 106:7–108:10.
[53] Pl.'s Ex. 13.

finds that these payments were infrequent and insubstantial when viewed in the context of the more than $2 million in commissions Mr. Hussing received. These payments were also more consistent with a father providing his young adult daughter some financial support, rather than evidence of any conspiracy.

### E.   Mr. Hussing Leaves and Pampa Sues Him.

Mr. Hussing left his job at Pampa in May 2021.[54] About three months later Pampa sued him – along with Ms. Hussing, Ms. Rosensteiner, Fenix Marketing and Votnik – in state court, asserting claims for breach of fiduciary duty against Mr. Hussing; aiding and abetting breach of fiduciary duty against all defendants; civil conspiracy to breach fiduciary duty against Fenix Marketing and Votnik; civil conspiracy to breach fiduciary duty against Ms. Hussing and Ms. Rosensteiner; breach of contract against Mr. Hussing; and enforcement of the non-compete and non-solicitation agreement against Mr. Hussing.[55] Nothing in that complaint, however, accused Mr. Hussing of fraud, making false representations, or false pretenses. Rather, Pampa complained only that Mr. Hussing had – and breached – a fiduciary duty, that other people and entities aided and abetted or conspired with him to do so, that he breached a contract, and that enforcement of his agreement not to compete or solicit was necessary.

### F.   Mr. Hussing Files for Bankruptcy.

After about a year of litigation in state court, Mr. Hussing filed a voluntary petition under chapter 7 of the Bankruptcy Code on September 8, 2022. By the time

---

[54] Pl.'s Ex. 37 at 215:16-19.
[55] ECF No. 7-1.

he filed for bankruptcy, the only assets of any material value he had – according to his bankruptcy schedules – were two automobiles, some miscellaneous personal property, and his business interests (which he valued at $0.00) in a few limited liability companies, including Natural Treats of America LLC, of which he listed himself as CEO.[56] His case was designated as a "no-asset" chapter 7 case, and to date the chapter 7 trustee has not filed any notice indicating that assets would be available for distribution to creditors. As such, no claims bar date has been set, and neither Pampa, nor any other creditor, has filed any proofs of claim.

On October 13, 2022, Pampa removed the state court litigation to this court, and that same day filed in this court a separate complaint to determine dischargeability of debt.[57] Although no allegations of fraud were raised in the state court complaint, Pampa alleged in its bankruptcy complaint to determine dischargeability that the debt allegedly owed to it based on the conduct alleged in the state court complaint was indeed a debt for money to the extent obtained by false pretenses, a false representation, or actual fraud, which should be excepted from discharge under Bankruptcy Code section 523(a)(2)(A).

The removed action and the dischargeability action were then consolidated. Taking into account the earlier state court proceedings (including defaults), motions

---

[56] Case No. 22-16984 (ECF No. 11).

[57] The complaint to determine dischargeability also included a count seeking a determination that the non-compete agreement was not a "claim" as that term is defined in 11 U.S.C. § 101(5) and therefore is not dischargeable in bankruptcy. The Court later granted summary judgment to Mr. Hussing on this count and dismissed it. (ECF No. 82).

practice in this court,[58] and certain voluntary dismissals,[59] this Court then held a trial on the remaining claims for (a) breach of fiduciary duty against Mr. Hussing; (b) aiding and abetting breach of fiduciary duty against Ms. Hussing; (c) civil conspiracy to breach fiduciary duty against Ms. Hussing; and (d) a determination of whether Mr. Hussing's debt to Pampa is excepted from his bankruptcy discharge.

## II.   CONCLUSIONS OF LAW.[60]

### A.   Jurisdiction and Adjudicatory Authority.

The Court has previously determined that it has subject matter jurisdiction over these consolidated adversary proceedings under 28 U.S.C. § 1334(b).[61] Pampa's claim for determination of dischargeability of a debt is a core proceeding under 28 U.S.C. § 157(b)(2)(I), as to which this Court can enter final orders or judgments.[62] Pampa's claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and civil conspiracy to breach fiduciary duty, however, are not core proceedings.[63] But the Court can still enter final orders or judgments on these claims because all parties have consented to the Court doing so.[64]

---

[58] In addition to granting Mr. Hussing summary judgment on dischargeability of the non-compete agreement, the Court also granted him summary judgment on Pampa's claim to enforce the non-compete agreement and dismissed that count as well. (ECF No. 82).

[59] In advance of trial, Pampa voluntarily dismissed all claims against Ulla Rosensteiner without prejudice, and voluntarily dismissed its breach of contract claim against Mr. Hussing without prejudice. (ECF No. 87).

[60] To the extent any of these conclusions of law are determined to constitute findings of fact, they are adopted as such. And to the extent any of these conclusions of law are determined to constitute mixed questions of law and fact, an appellate court should consider them under the standard set forth in *Village at Lakeridge*, 583 U.S. at 396.

[61] ECF No. 23.

[62] 28 U.S.C. § 157(b)(1).

[63] *See In re Allied Sys. Holdings, Inc.*, 524 B.R. 598, 606 (Bankr. D. Del. 2015); *In re Transcare Corp.*, 2020 WL 8021060, at *17 (Bankr. S.D.N.Y. 2020), *adopted as modified sub nom. In re TransCare Corp.*, 2021 WL 4459733 (S.D.N.Y. 2021), *aff'd*, 81 F.4th 37 (2d Cir. 2023).

[64] 28 U.S.C. § 157(c)(2); Fed. R. Bankr. P. 9027(e)(3); *see* ECF No. 1, at 3 n.1; ECF No. 23, at 3 ¶ C.

**B.       Dischargeability of Debts in a Chapter 7 Case.**

The goal of most individual chapter 7 debtors is to obtain a discharge of their prepetition debts. Even if a debtor receives a discharge, however, certain debts may be excepted from that discharge. This includes debts "for money . . . to the extent obtained by . . . false pretenses, a false representation, or actual fraud,"[65] which are not dischargeable under Bankruptcy Code section 523(a)(2)(A).[66] Courts construe exceptions to discharge liberally in favor of debtors.[67] Or, as more precisely stated by the Supreme Court in *Bartenwerfer v. Buckley*,[68] exceptions to discharge "should not extend beyond their stated terms."[69] Creditors challenging dischargeability have the burden to prove, by preponderance of the evidence, that their debt is not dischargeable.[70] "Of course a predicate to this burden is establishing that they have any debt at all that may be subject to an exception from discharge."[71]

In this case, Pampa argues that Mr. Hussing's debt – which as of trial was based solely on a claim for breach of fiduciary duty – is a debt for money to the extent obtained by false pretenses, a false representation, or actual fraud, that should be excepted from discharge under section 523(a)(2)(A). For its debt to be excepted from discharge, Pampa therefore had to prove, by preponderance of the evidence, first that Mr. Hussing is liable to it for the common law tort of breach of fiduciary duty, and

---

[65] 11 U.S.C. § 523(a)(2)(A).

[66] Debts "for fraud or defalcation while acting in a fiduciary capacity" are also excepted from discharge under Bankruptcy Code section 523(a)(4). But Pampa has not contended that its breach of fiduciary duty claim was for a debt for fraud or defalcation while acting in a fiduciary capacity.

[67] *In re Miller*, 39 F.3d 301, 304 (11th Cir. 1994) (citing *In re Tully*, 818 F.2d 106, 110 (1st Cir. 1987)).

[68] 598 U.S. 69 (2023).

[69] *Id.* at 77.

[70] *Grogan v. Garner*, 498 U.S. 279, 287-88 (1991).

[71] *In re Daly*, 655 B.R. 255, 263 (Bankr. S.D. Fla. 2023).

second that this liability is a debt for money to the extent obtained by false pretenses, a false representation, or actual fraud. The Court therefore begins its analysis with Pampa's removed state court claim for breach of fiduciary duty.

### C.    Mr. Hussing Did Not Owe Pampa a Fiduciary Duty.

To prevail on a claim for breach of fiduciary duty under Florida law, a plaintiff must prove the existence of a fiduciary duty, and that breach of that duty proximately caused it damages.[72] Relying on the 1983 Florida Third District Court of Appeal decision in *Phillips Chemical Company v. Morgan*,[73] Pampa argues that Mr. Hussing owed – and breached – a fiduciary duty to Pampa. The facts of *Phillips Chemical* are remarkably similar to the facts here, and at first glance would appear to strongly support Pampa's position.

> 1.    *Phillips Chemical* Does Not Stand Squarely for the Proposition That Under Florida Law an Employee Per Se Owes a Fiduciary Duty to His Employer.

In *Phillips Chemical*, a long-time employee of Phillips Chemical Company, Maurice Morgan, and another individual, Kenneth Gamble, set up a shell company called Gam-Co. Corp. to act as a middleman to buy from, or sell chemical products to, Phillips Chemical. Mr. Gamble then agreed to and did remit to another shell company set up by Mr. Morgan fifty percent of the profits on either sales to Phillips Chemical or resale to others of the chemicals Gam-Co had purchased.[74] When Phillips Chemical learned of this, it fired Mr. Morgan and terminated its relationship with Mr. Gamble

---

[72] *Gracey v. Eaker*, 837 So.2d 348, 353 (Fla. 2002).
[73] 440 So.2d 1292 (Fla. 3d DCA 1983)
[74] *Id.* at 1293.

14

and Gam-Co.[75] Gam-Co then sued Phillips Chemical for an unpaid shipment. Phillips Chemical counterclaimed against Gam-Co and brought a third-party action against Mr. Gamble for the gross profits he had split with Mr. Morgan.[76] Mr. Morgan was named as a third-party defendant to recover the kickbacks he had been paid.[77]

A jury found against Phillips Chemical on all counts. Phillips Chemical appealed. The Third DCA reversed on all counts, concluding that Phillips Chemical's motions for directed verdict in its favor should have been granted.[78] Citing the 1930 Florida Supreme Court decision in *Connelly v. Special Road & Bridge District No. 5*,[79] and the 1977 Florida Third DCA decision in *Vining v. Smith*,[80] the Third DCA in *Phillips Chemical* stated – without any analysis – "that the transactions contrived by Morgan with Gamble and Gam-Co were in blatant disregard of the most elemental fiduciary duties owed an employer not to deal in his business for the agent's own benefit."[81]

Although cited by the Third DCA in support of its conclusion, in *Connelly* the Florida Supreme Court did not specifically hold that an employee owes a fiduciary duty to an employer. It only concluded that *"[t]he facts in the case before us* show clearly that [the employee] sustained a fiduciary or confidential relation to his employer, Connelly, so long as the relation of employer and employee continued."[82]

---

[75] *Id.* at 1294.
[76] *Id.*
[77] *Id.*
[78] *Id.*
[79] 126 So. 794, 797 (Fla. 1930).
[80] 343 So.2d 871, 872 (Fla. 3d DCA 1977).
[81] *Phillips Chem. Co.*, 440 So.2d at 1294.
[82] 126 So. at 797 (emphasis added).

Likewise, *Vining*[83] – the other case cited by *Phillips Chemical* for the proposition that an employee owes his employer a fiduciary duty – was a per curiam affirmance of a trial court's grant of partial summary judgment to clients who sued their real estate broker for concealing facts about the greatly increased value of land he was to sell for them. The Third DCA held in that case that "a broker can neither purchase from, nor sell to, his principal unless the latter expressly assents thereto or, with full knowledge of all the facts and circumstances, acquiesces in such a course."[84] But neither *Vining* nor *Connelly* actually holds that as a matter of law an employee owes his employer a fiduciary duty. Rather, it was the particular circumstances of each case that led those courts to conclude a fiduciary duty existed.

        2.    <u>The Precise Contours of an Employee's Duties to His or Her Employer Are Not Clear under Florida Law.</u>

The takeaway from *Phillips Chemical* then, is that an employee may under certain circumstances owe a fiduciary duty to his or her employer. But neither *Phillips Chemical* nor the cases it cites stand squarely for the proposition that under Florida law an employee per se owes a fiduciary duty to his or her employer. To be sure, there are other reported decisions stating that an employee owes a fiduciary duty to his or her employer under Florida law.[85] But, like *Phillips Chemical*, a close reading of those cases – and the cases they rely on – reveals the absence of any clear holding by the Florida Supreme Court or any Florida District Court of Appeal that as a matter of law, an employee owes his or her employer a fiduciary duty.

---

[83] 343 So.2d 871.
[84] *Id.* at 872.
[85] *See, e.g., Charles Schwab & Co. v. McMurry*, 2008 WL 5381922, at *1 (M.D. Fla. 2008)).

16

For example, in *Charles Schwab & Co. v. McMurry*,[86] a decision from the United States District Court for the Middle District of Florida, the court did state that "[i]t is well-established under Florida law that an employee owes a fiduciary duty and a duty of loyalty to his or her employer."[87] But in support of that proposition, the court cited *Life Marketing of Florida, Inc. v. A.I.G. Life Insurance Co.*,[88] which in turn cited *Connelly*.[89] In *Life Marketing of Florida*,[90] though, what Florida's Fifth District Court of Appeal actually said – citing *Connelly*[91] – was that "[t]he duty of the agent to be faithful to his principal is inviolable and extends beyond the termination of the parties' relationship."[92] Thus, notwithstanding the dicta in numerous reported decisions stating that an employee owes his or her employer a fiduciary duty, it is actually not at all "well-established" under Florida law that an employee owes a fiduciary duty to his or her employer.

Further supporting the notion that under Florida law the contours of an employee's duties to his or her employer are less than clear is that in 1995 the Florida Supreme Court in *Roque v. State*[93] invalidated as impermissibly vague and arbitrary Florida's commercial bribe receiving statute, Fla. Stat. § 838.15.[94] That law made it

---

[86] *Id.*
[87] *Id.* at *1.
[88] 588 So.2d 663, 665 (Fla. 5th DCA 1991).
[89] 126 So. 794.
[90] 588 So.2d at 665.
[91] 126 So. 794.
[92] 588 So.2d at 665.
[93] 664 So.2d 928, 929 (Fla. 1995)
[94] *Id.*

a third-degree felony for an employee to accept a benefit in return for violating a

common law duty.[95] In invalidating it, the Florida Supreme Court noted that:

> Few workers in Florida, however, are aware that they owe such a
> "common law duty" to their employers and fewer still could define the
> dimensions of that duty. In fact, substantial legal research would be
> required by many employees to determine their obligations under the
> law.[96]
>
> > By the terms of this act every . . . employee . . . is required
> > to determine at his peril what specific acts are authorized
> > by law and what are not authorized by law. Honest and
> > intelligent men may reasonably have contrary views as to
> > whether or not a specific act . . . is or is not authorized by
> > law and, therefore, the violation or non-violation of this
> > statute may reasonably depend upon which view the court
> > or a jury may agree with.[97]
>
> . . . The statute "is too vague to give men of common intelligence
> sufficient warning of what is corrupt and outlawed."[98]

In sum, it is far from "well-established" under Florida law that an employee owes his

or her employer a fiduciary duty.

> 3.    Determining Whether a Fiduciary Duty Exists Requires a Highly
>       Factual Inquiry into the Parties' Relationship and the
>       Transaction at Issue.

So if an employee does not per se owe a fiduciary duty to his or her employer,

how do courts determine under what circumstances an employee might have such a

duty? By examining the facts and circumstances of each case to determine whether

the relationship is one "based on trust and confidence between the parties where

---

[95] *Id.*

[96] *Id.*

[97] *Id.* (quoting *Locklin v. Pridgeon*, 30 So.2d 102, 105 (Fla. 1947)).

[98] *Id.* (quoting *State v. DeLeo*, 356 So.2d 306, 308 (Fla. 1978)). It is also noteworthy that the statute –
although invalidated – listed as separate, distinct duties (among others) that of an "agent or employee
of another" and that of a "trustee, guardian, or other fiduciary," Fla. Stat. § 838.15, suggesting that a
fiduciary duty is a duty distinct from other common law duties an employee might owe its employer.

'confidence is reposed by one party and a trust accepted by the other.'"[99] Indeed, notwithstanding Pampa's reliance on *Phillips Chemical* and its argument that an employee per se owes his or her employer a fiduciary duty, most Florida courts have acknowledged that whether a fiduciary relationship exists is often a highly-factual inquiry into the parties' relationship and the transaction at issue.[100]

A predicate to any fiduciary relationship, however, is "some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party."[101] Quoting from the comments to the Restatement (Second) of Torts, the Florida Supreme Court has noted that "[a] fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of that relation."[102] But "[w]hen the parties are dealing at arm's length, a fiduciary relationship does not exist because there is no duty imposed on either party to protect or benefit the other."[103]

---

[99] *Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*, 850 So.2d 536, 540 (Fla. 5th DCA 2003) (quoting *Doe v. Evans*, 814 So.2d 370, 374 (Fla. 2002) (quoting *Quinn v. Phipps*, 113 So. 419, 421 (Fla. 1927))); *see also Honig v. Kornfeld*, 339 F.Supp.3d 1323, 1337 (S.D. Fla. 2018).

[100] *Taylor Woodrow Homes*, 850 So.2d at 540 (citing *Doe*, 814 So.2d at 374; *Capital Bank v. MVB, Inc.*, 644 So.2d 515, 518 (Fla. 3d DCA 1994)).

[101] *Taylor Woodrow Homes*, 850 So.2d at 540-541 (quoting *Watkins v. NCNB Nat'l Bank of Fla., N.A.*, 622 So.2d 1063, 1065 (Fla. 3d DCA 1993)), *rev. den.* 634 So.2d 629 (Fla. 1994)); *see also In re January 2021 Short Squeeze Trading Litig.*, 584 F.Supp.3d 1161, 1194 (S.D. Fla. 2022), *aff'd*, 76 F.4th 1335 (11th Cir. 2023) ("In order for a confidential or fiduciary relationship to exist under Florida law, there must be substantial evidence showing some dependency by one party and some undertaking by the other party to advise, counsel, and protect the weaker party.") (quoting *Lanz v. Resolution Tr. Corp.*, 764 F.Supp. 176, 179 (S.D. Fla. 1991)).

[102] *Doe*, 814 So.2d at 374 (quoting RESTATEMENT (SECOND) OF TORTS, § 874, cmt. a. (1979)).

[103] *Taylor Woodrow Homes*, 850 So.2d at 540-541 (citing *Watkins*, 622 So.2d at 1065; *Maxwell v. First United Bank*, 782 So.2d 931 (Fla. 4th DCA 2001); *Capital Bank*, 644 So.2d at 518; *Morton v. Young*, 311 So.2d 755 (Fla. 3d DCA 1975)); *see also Stonepeak Partners, LP v. Tall Tower Capital, LLC*, 231 So.3d 548, 552–53 (Fla. 2d DCA 2017) ("A fiduciary relationship does not exist in an arms' length transaction"); *Honig*, 339 F.Supp.3d at 1337.

4. <u>Mr. Hussing Was in an Arm's Length Transaction with Pampa, so He Did Not Owe It Any Fiduciary Duty</u>.

The critical question in this case boils down to whether Mr. Hussing's relationship with Pampa was an "arm's length" transaction – in which case he owed no fiduciary duty to Pampa – or whether there was "a relation of trust and confidence between them; that is, where confidence is reposed by one party and a trust accepted by the other."[104] Based on the facts of this case, the Court concludes that the relationship was arm's length, and that Mr. Hussing was not in a relation of trust and confidence with Pampa. To be sure, Mr. Hussing violated the contractual terms of that arm's length transaction. But he did not have – and did not breach – any common law fiduciary duty.

Although given the title of Vice President – and later Chief Operating Officer[105] – of Transnational Supply, he was not actually an officer of Transnational Supply or Pampa.[106] Indeed, Transnational Supply was not even a separate entity. It was merely a division of Pampa and a "d/b/a" Pampa used for its non-food product line. Mr. Hussing never had check signing authority over any company bank accounts.[107] He never signed contracts for the company.[108] He did not work with company accountants to prepare financial statements.[109] He did not have access to the

---

[104] *Quinn*, 113 So. at 421.
[105] Pretrial Order ¶ cc.
[106] If Mr. Hussing had actually been an officer of Transnational Supply or of Pampa (if Pampa was a separate legal entity), then he would have owed the company a fiduciary duty. *See Scherer v. Austin Roe Basquill, P.A.*, 325 So.3d 175, 189 (Fla. 2d DCA 2021) ("officers and directors owe fiduciary duties to the corporation and its shareholders"); *Taubenfeld v. Lasko*, 324 So.3d 529, 538-39 (Fla. 4th DCA 2021) (same); *Cohen v. Hattaway*, 595 So.2d 105, 107 (Fla. 5th DCA 1992) (same).
[107] Trial Tr. 83:14-17.
[108] *Id.* at 83:18-21.
[109] *Id.* at 83:22-84:2.

20

company's profit and loss statements or accounting records.[110] He did not sign any company tax returns.[111] And he was not responsible for paying employees.[112] His only role was to procure international and domestic sources of pet treats, soaps, and home glassware for sale to U.S. retailers.[113]

While Pampa did apparently leave Mr. Hussing somewhat unsupervised in performing his duties, it did so at its own peril.[114] Pampa certainly was not the "weaker party" in the relationship, who looked to Mr. Hussing to "advise, counsel, and protect it."[115] Nor was Mr. Hussing "under a duty to act for or to give advice for the benefit of [Pampa] upon matters within the scope of that relation."[116] Rather, Mr. Hussing was merely an employee Pampa hired to grow its non-foods business line. This was clearly an arms' length relationship. Mr. Hussing had an employment agreement with Pampa, documented in the form of a series of email exchanges and an executed, written "Non Compete and Non Disclosure Agreement" that detailed the contours of the relationship and the rights and obligations of Mr. Hussing and Pampa. Because they had an arms' length transaction, Mr. Hussing did not owe Pampa any fiduciary duty. And because he did not owe any fiduciary duty to Pampa, he could not

---

[110] *Id.* at 68:10-17.
[111] *Id.* at 84:3-4.
[112] *Id.* at 84:5-17.
[113] Pretrial Order ¶¶ bb, ee.
[114] That Pampa failed to adequately supervise and monitor its employee does not transform the relationship into a fiduciary one. "In an arms-length transaction . . . there is no duty imposed on either party to act for the benefit or protection of the other party, or to disclose facts that the other party could, by its own diligence have discovered." *Watkins,* 622 So.2d at 1065-66 (quoting *Lanz,* 764 F.Supp. at 179; citing *Bankest Imports, Inc. v. Isca Corp.,* 717 F.Supp. 1537, 1541 (S.D. Fla. 1989); *Cripe v. Atlantic First Nat'l Bank,* 422 So.2d 820 (Fla. 1982)).
[115] *See Taylor Woodrow Homes,* 850 So.2d at 540-541; *Watkins,* 622 So.2d at 1065; *Jan. 2021 Short Squeeze Trading Litig.,* 584 F.Supp.3d at 1194; *Lanz,* 764 F.Supp. at 179.
[116] *See Doe,* 814 So.2d at 374; RESTATEMENT (SECOND) OF TORTS, § 874, cmt. a.

21

have breached any fiduciary duty, and therefore he is not liable to Pampa for breach of fiduciary duty. Judgment will therefore be entered in favor of Mr. Hussing and against Pampa on its breach of fiduciary duty claim.

### D.   Because Mr. Hussing Did Not Owe Pampa a Fiduciary Duty, Pampa's Other Claims All Fail.

Because Mr. Hussing did not owe Pampa a fiduciary duty and he therefore has no liability to Pampa for breach of fiduciary duty, he owes no debt to Pampa for this tort that could be excepted from discharge.[117] Judgment will therefore be entered against Pampa and in favor of Mr. Hussing on its claim to determine dischargeabilty.

As for Ms. Carolina Hussing, Pampa has alleged that she aided and abetted her father in breaching his fiduciary duty and conspired with her father to breach his fiduciary duty. To prove a claim for aiding and abetting breach of fiduciary duty under Florida law, the plaintiff must establish: (1) the primary wrongdoer had a fiduciary duty; (2) a breach of that fiduciary duty; (3) knowledge of the breach by the alleged aider and abettor; and (4) substantial assistance or encouragement of the wrongdoing by the alleged aider and abettor.[118] For civil conspiracy under Florida law, the plaintiff must prove: (1) an agreement between two or more parties; (2) to do an unlawful act or a lawful act by unlawful means; (3) an overt act in furtherance of the conspiracy; and (4) resulting damage to the plaintiff.[119] A predicate to those four

---

[117] *See Daly*, 655 B.R. at 263 (establishing the existence of a debt is a predicate to determining a debt is not dischargeable).

[118] *Taubenfeld*, 324 So.3d at 540-41 (quoting *Fonseca v. Taverna Imps., Inc.*, 212 So.3d 431, 442 (Fla. 3d DCA 2017)).

[119] *Logan v. Morgan, Lewis & Bockius LLP*, 350 So.3d 404, 412 (Fla. 2d DCA 2022) (quoting *Plastiquim S.A. v. Odebrecht Constr., Inc.*, 337 So.3d 1270, 1273 (Fla. 3d DCA 2022)).

elements, of course, is "an actionable underlying tort or wrong."[120] Here, because the Court has found that Mr. Hussing did not owe – and therefore did not breach – any fiduciary duty to Pampa, both the aiding and abetting claim and the civil conspiracy claims against Ms. Hussing fail.[121]

Finally, although Votnik and Fenix Marketing have defaulted – and therefore have not contested the allegations against them – because the Court has concluded that Mr. Hussing did not breach any fiduciary duty, neither Votnik nor Fenix Marketing can be liable for aiding and abetting, or conspiracy, to breach fiduciary duty, either. Judgment will therefore be entered in favor of Votnik and Fenix Marketing, and against Pampa, on these counts as well.

### E.    Mr. Hussing's Other Defenses Are Moot.

Because the Court has concluded that Mr. Hussing did not owe Pampa a fiduciary duty, the Court need not determine whether the "independent tort doctrine"[122] – which, according to Mr. Hussing, prohibits Pampa from recasting a breach of contract claim as a tort claim to obtain a preferred damages model – applies here. Mr. Hussing's failure-to-prove causation and damages defense is also moot. With no tort liability, the Court need not determine whether Mr. Hussing's conduct

---

[120] *See id.*

[121] Pampa also failed to prove any agreement amongst Ms. Hussing and her father to conspire and failed to prove substantial assistance by Ms. Hussing. The evidence showed only that Ms. Hussing was a young college graduate trying to help her father keep his finances and records organized in the wake of a messy divorce, who also accompanied her father from time to time on some of his business trips so that she could tour and sightsee in foreign countries.

[122] Under current case law, the precise definition of the independent tort doctrine, whether it exists under Florida law, and if so, how and when it applies, are all unclear. *See, e.g., Simmons v. USI Ins. Servs., LLC*, 2024 WL 946287, at *3 (M.D. Fla. Mar. 5, 2024) (describing case law on the independent tort doctrine as "somewhat vague and at times inconsistent").

actually damaged Pampa. And finally, the Court need not decide whether the alleged debt at issue – one for a claimed breach of fiduciary duty – could only be non-dischargeable (if at all) under Bankruptcy Code section 523(a)(4) (which specifically excepts from discharge a debt for fraud or defalcation while acting in a fiduciary capacity), or whether a common law tort claim for breach of fiduciary duty can also be a "debt . . . for money . . . to the extent obtained by . . . false pretenses, a false representation, or actual fraud" that could be non-dischargeable under Bankruptcy Code section 523(a)(2)(A).[123]

## III.    CONCLUSION.

There is no question Mr. Hussing lied to Pampa, was deceitful, and solicited and accepted kickbacks in violation of his employment agreement. Indeed, some of the evidence – particularly his use of the made-up name "John Votnik" to obtain $24,800.00 in kickbacks from Kwan Treats – supported a finding that Mr. Hussing did obtain money by false pretenses, false representations, or actual fraud. But for a debt to be excepted from discharge, it is not enough that the debtor obtained money by false pretenses, a false representation, or actual fraud. This conduct must also create a liability that results in a debt to the creditor. At trial, however, Pampa relied solely on the common law tort of breach of fiduciary duty as the basis for the debt it sought to except from discharge. But because the Court concluded Mr. Hussing did not owe – and therefore could not breach – a fiduciary duty to Pampa, he is not liable

---

[123] Because Pampa dismissed its breach of contract claim before trial, the Court also need not determine whether a debt for breach of a contract could constitute a debt for money to the extent obtained by false pretenses, a false representation, or actual fraud, that might be excepted from discharge under section 523(a)(2)(A).

to Pampa for breach of fiduciary duty. Thus, he owes no debt for breach of fiduciary duty that could be excepted from discharge. And because all of Pampa's other claims depend on establishing its breach of fiduciary duty claim, all its other claims fail as well. The Court will therefore enter a final judgment in favor of Mr. Hussing, Ms. Hussing, Fenix Marketing, and Votnik, and against Pampa, on all remaining counts in the two consolidated adversary proceedings.

# # #

Copies furnished to all counsel of record via CM/ECF.